The honors and may it please the court, my name is Brian Lewis and I'm here on behalf of the trustee Ashley Quinones and her 1983 action against the City of Edina, the City of Ridgefield and their individual officers. We are here on a grant of a motion for summary shooting of the trustee's late husband. The trial court made extensive findings of fact and some of the findings of fact implicate obviously a lot of this court's jurisprudence in section 1983 claims. To put the long story short, this started out as a traffic stop and ended up with a person dead on the side of the road or in a front yard with about seven holes in him out of 18 shots. Well, it didn't start with a traffic stop. It started well before that. Which was the police officer activating his lights to pull the car over for a... Do you know what the family, what he told the family in leaving? His wife's search and his flight from when they attempted to locate him? Your Honor, my understanding is that if you're talking about the... The circumstances on excess force. Yes, Your Honor. The whole incident... Yes, Your Honor. ...is potentially relevant. Yes, Your Honor. And so it started with what he told his grandfather and his son before... Your Honor... ...bolting the house. Yes. And that, well, if you back up to that, then there were some statements made. The content, as Your Honor describes, begins with the decedent in some sort of psychological distress. Now, remind me, had that been communicated to the police? Had they been told when they started toward the traffic stop that the person had been in psychological distress? There was a statement in the record, and I can't remember if it was before the shooting or after, that he was suicidal. Yeah, but I thought they might have been alerted to that. And the other, I would guess, clue there is that the trustee was trying to keep up with the pursuit of the husband. Right. So... They knew that. And they saw that. Right. But at the beginning of the interaction with the police was for a potential traffic stop, which is where I was trying to go, Judge Logan. But with this heightened mental distress going on, and let's be honest, not a lot of people want to bring a knife to a gunfight. And if you have six or seven cops around you, that's pretty much what you've done. And it shows that he was in clear psychological distress. One of my bottom line questions is, how do you distinguish our opinion in Hassan? I'm sorry, say that again, Your Honor? Hassan, the machete-wielding person on Lake Street. United States v. 489 F. 3rd 914. I do recall the case. And if my memory is correct on that, the machete on Lake Street is drastically different than here. But I don't believe that that was... that the knife-wielding victim was reasonably perceived as a threat to the officers. That's what the essential commonality is between the two cases. And I would submit that even assuming the distance from here to you or here to the panel, that a person with a knife is very unlikely to be a threat. With an ax or with a gun, you might have a slightly different argument. But a person with a knife in clear psychological distress is very unlikely to be a threat. In fact, our position through this has been that he wasn't, that the person, that the decedent was not moving toward officers. He was trying to move... The video refutes that. Your Honor, what the video showed was that he was moving in... Shows this, right? Yes, Your Honor. I believe it shows this or it shows... I forget which way his wrist was turned, but yes, I do remember seeing a sign of a knife. But from here, from the distance we are now, even if I'm holding a knife like this, the fact, plain and simple fact, I can't be an imminent threat of danger. But he's moving the knife and he's moving forward. There's a taser that's fired. It doesn't appear to have any impact on him. And I don't know. Maybe I missed something. But my recollection is that they had evidence that he was overtly suicidal because of the things that he did and said on the scene, right? But I don't know that... I thought that the first time that the family conveyed to the police that he was suicidal was when Ashley, after the shooting, made the report to him that he'd been acting bizarrely and he was suicidal. Is there someplace in the record I've missed where there was... that the police had contact with the family before the traffic stop? And just so that way we're on the same sheet, Judge Erickson, are you talking about before the cops made the initial... Yeah, the initial traffic stop. At that point, I think they had no knowledge or information that he was suicidal. He's just a guy driving erratically. And I think that the evidence that he was suicidal is never actually conveyed by a family member to officers until the aftermath of the shooting. Am I wrong? Your Honor, I believe you are correct in terms of at the initial point where the initial traffic stop happened. Right. Discounting anything that was said to the family before that, what Judge Loken was talking about earlier, I think you are correct that there was no report to the police officers. So what did officers observe? They observed a person driving erratically. He's eventually stopped, right? Correct. And to be clear on that, I want to say it was disregarding a traffic light, but there was something there that occasioned the stop. Yes, Your Honor. And when he stopped, he acts unusually. He's got a knife. He comes towards the officers, right? And they might at that point, given what he's saying, what he's doing, observe that this is a person who wants to commit suicide by cop. I get where that argument can be made. They try and tase him. They're backing up. He's moving towards them. And they get to the point where they feel they're at risk. This all happens, if you look at the video, in a very short period of time. Yes, Your Honor. Okay. And so how far do they have to let the guy get into you before you can say, I'm in harm's way, and that courts ought to be able to second-guess you and deprive you of qualified immunity? Your Honor, for a lot of those reasons, this court's jurisprudence has been very situational in that regard. And with a knife, and I believe the record shows that it was a plain butcher knife, kitchen knife, something along that line, I would say that you have to be close enough where if you, in essence, take the next step, and I kind of revert back to the last clear chance doctrine, even though it's not applicable here, that if you're that close, then you take that next step, you're there, and the police officer has the next decision whether to use deadly force or not. But I would say So lunging distance? Maybe a hair more than that, but yes. That would be my answer to that. They weren't there. Now, once, as Your Honor Our decision in Cook is quite inconsistent with that. Your Honor, I remember Cook was a little bit, but if I recall correctly, Cook was decided after Ludwig, and I may be mistaken there, but Cook's in the last few years. Correct. So in this circuit, the rule is that the earlier decision panel, the decision of the earlier panel must control, and since Ludwig preceded Cook under Mater, which is this court's en banc That was on the Cook panel. I'm sure Ludwig was cited in the briefs, if not in the It was, Your Honor. Okay. So, you know, the panel in Cook did not ignore Ludwig, and Ludwig is not this case. Also, on the question of mental disability precluding use of excessive or deadly force, Hayek v. City of St. Paul is squarely to the contrary. Your Honor, it William's mental state does not change the fact that he posed a deadly threat to the officers. Your Honor, what I believe you're citing into Hayek is Hayek took place in a lot closer area. Even though mental disability does not change whether somebody is a threat to the officer, a direct threat, mental disability does play into the totality of the circumstances under which the officers judge reasonable force. And so what we're going to do from a reasonable force standpoint is we're going to decide what's the risk to the officer at the time that the shooting's initiated, right? Yes, Your Honor. And we're not going to do that with the sort of backward-looking, second-guessing, Monday quarterbacking kind of a standard, right? That's what it is. Because our law makes plain that a mentally ill person is not rendered less dangerous because they're mentally ill. It's only something that you can consider in making a determination as to the totality of the circumstances, what kind of a threat does the person really represent, right? Yes, Your Honor. And so what's your best argument that these officers are mistaken when they believed he was a threat to them at that point? Your Honor, first I would say that there's the distance argument to be made. There's the direction of movement argument. And even though it doesn't change the calculus, the mental disability or mental crisis standard means that the officer has to take that into account as well when making the decision of whether the officer's reasonably endangered. And in this case, we're not in a crowded apartment as we were, I believe, in Cook. We're not, and I believe Hayek was somewhere along that line. But we're in an open area, essentially. We have homes on one side. We have a street on the other. So we're not in those tight quarters where the officers are being called upon to make a split-second decision. And that would be my best argument on that. And I see that I have a few minutes left, and with the Court's permission, I'd like to save those for rebuttal. Now, the district court decided this on what's typically referred to as the first prong of qualified immunity. Yes, Your Honor. And would you agree that if we were to reverse, it would go back down and you would face the second prong? Yes, Your Honor. Clearly established. Absolutely. And what's your best case on that? Your Honor, we cited those in the briefs, and I'm happy to answer Your Honor's question on rebuttal. But my understanding of the cases is that we've established the, and I'm not recalling it off the top of my head, Your Honor. The Supreme Court has just had a clearly established decision on excessive force. They did, Your Honor. And it doesn't help your side. No, it does not, Your Honor. I'll concede that. That's enough said. Thank you, Your Honor. Kelly? Good morning.  Your Honor, I'd like to first address Mr. Lewis's comments about distance and movement. The primary issue here is that the record does not support his arguments that distance or movement should be a factor for the Court's consideration. The record clearly demonstrates that at all times Kunyonis controlled the movements. From the moment he exited that vehicle, holding the blade in his hand, he advanced upon Peterson. Peterson was immediately forced to retreat. At all times, he controlled the movements. In Mr. Lewis's argument, he made the comment, and I'm unclear of whether or not he's attempting to create a fact issue here, but there is no fact issue. He was not, he's claiming he was not, excuse me, he's claiming Kunyonis was not moving towards the officers. However, in his brief, he admits on page 7 that Kunyonis moved towards Officer Schultz. What the video clearly shows is that he charged at Officer Schultz. There is no question that in that moment, facing those circumstances, particularly involving an individual who's armed with a bladed weapon, who's charging at a fellow officer, that the use of deadly force is warranted and justified. Next, I'd like to address the conversation that this Court had with – the threat wasn't imminent enough because the distance was great enough to where the officers didn't reasonably use force. As he was charging, Your Honor? Yeah, he was talking this morning about the distance between the charging person and the officers. There's no case law that requires that an officer is not allowed to use deadly force until the person actually gets to them with the bladed weapon. No, I wouldn't think so. But there may be a case that says if you're 100 yards away, it's too soon to shoot. Your Honor, that's not the case here regardless. And for example – I'm just trying to get to the point. You said distance is not relevant. I thought you started out saying distance is not relevant. It must be relevant because if the person's a mile away, it's not an imminent threat. So the question is how close was he and did he pose an imminent threat? Yes, Your Honor. And I apologize, I should have clarified. For the purposes of under the Fourth Amendment analysis, we look at the circumstances in this particular case. And in this particular case, distance is not relevant. Distance – Yeah, it's relevant because if he was close enough to pose an imminent threat, then force was reasonable. So how close was he when he was – Yes, Your Honor. – holding the knife up? How many feet away? Thirteen feet. Thirteen feet. I believe that the expert's report indicated that he was about 13 feet away, certainly within 20 feet as argued in Mr. Lewis' brief, and certainly within distance to inflict serious harm or death upon the officers, warranting the use of deadly force. I mean, there was – Okay. So I don't understand why you say distance is not relevant. You're right, Your Honor. That's a mistake. I should not have – She's saying it's relevant that he was within 13 feet and posed a threat. Correct, Your Honor. Correct, Your Honor. I apologize. I misspoke. I misspoke. And to the same extent, this Court's correct. Nothing in the record suggests that the officers had any knowledge of the decedent's mental illness or mental distress prior to him charging at them, essentially. There is some mention in the record that he said, do it, do it. At best, that's the best argument that counsel has for any indication of a suicidal ideation. However, in that moment, and as the case law clearly sets forth, as Your Honor pointed out in Cook and Hayek and Hassan, all of those cases discuss the fact that mental illness or intoxication, as we saw in Cook, do not negate or change the harm or death, which is exactly the case here. Are you agreeing with the Minnesota legislature that suicide by cop perception precludes the use of deadly force if the cop believes he threatened? Can you ask that question again, Your Honor? Do you think that trumps 1983 jurisprudence? No, Your Honor. The Minnesota state law does not. They can say what they want, but we're talking about excessive force, constitutionally unreasonable excessive force. Federal rights, Your Honor, yes. And the Minnesota legislature says if the guy's suicidal, the cop's going to have to get killed. It seems to suggest that. I mean, in some, throwing a bone, Your Honor, to the legislation, it says that officers can consider it. But that particular one, I think, is not going to be followed in federal 1983 litigation. Yes, Your Honor. You know, and I want to go back to the relevance of distance and this knife and how close do you got to be and what do officers reasonably think. You know, if you look at competitive knife throwing, which is a stupid thing to look at, but, you know, they throw from 6 feet, 9 feet, 13 feet, and 16 feet. How do I know that? Because I've got all kinds of weird trivia in my brain. But 13 feet is clearly within the distance where people competitively throw knives. And so I think it's like if you can establish that the guy's within 13 feet, the officer's at risk at that point, particularly someone who's erratic and has not responded to a taser. And repeated commands to drop the knife, too. True, yeah. Yes, Your Honor. Absolutely. You're correct, Your Honor. I would agree with you on that. The circumstances facing the officers was that despite repeated commands to drop the knife, despite their attempts to — I mean, Peterson created space by backpedaling across the medium at great risk to himself. He could have tripped. He could have fallen. At great risk to himself, he's creating distance and backpedaling across the medium while pleading with him to drop the knife. And Officer Schultz is not required to let his fellow officers stand out there by himself. He moves to aid him. And if there's any concern that Officer Schultz is closing the distance, which, again, is not the case, he comes no closer to the decedent than Officer Peterson already is. But, again, there's no case law that says he's — Now, officers — a fact question. Officers Peterson and Schultz are — Edina. Your clients are Richfield. Does the record reveal whether the first two shots fired by the Edina police hit Mr. Quinones? No, Your Honor, but I would correct. Officer Peterson belongs to Edina and Officer Schultz belongs to Richfield. Okay. Well, I mean, the second round of shots at least were followed — fired by your — but So I thought there was some indication, and I didn't — I haven't studied the record, that he was holding on a tree and may have been hit by the first two shots. Is that — it's just unknown? Or is there any testimony about what — if any shot — if the initial shots hit him? And if there is — and what's the relevance of the sequential aspects of this? Yes, Your Honor. I do believe — I don't have the specific citation, but I do believe the record does establish that he was struck. But even if he wasn't struck — He was shot at. I was asking, was he shot? Yes, Your Honor. Or, excuse me, it's not clear in the record whether or not he was shot. At that point — You just said he was struck. You just said he was struck by the first shots. Now you're saying you don't know? Your Honor, the record's unclear of who he was struck by. It indicates he was struck at the first volley of shots. By some of the bullets. By some of the bullets. Yes, Your Honor. Okay. So was he disabled to the point where he no longer posed a threat, or was he still a threat? He was still a threat, Your Honor. And what's the evidence of that? Yes, Your Honor. He never dropped the knife. He's still moving towards the officers. This happened within a matter of seconds. The officers see that the first volley of shots have — or what they believe has struck him. It's unclear whether or not they knew if it had struck him or not. He seemed to be, as the testimony reveals, he was unfazed by that first volley. He maintains the weapon. He's still moving forward. He doesn't — there are renewed commands to him to drop the knife. He never drops the knife. He continues to move forward. The officers still believe that he poses a significant threat justifying the use of deadly force. Well, as I understood the record, now he's moving toward not just Peterson, but the late-arrival driving officers. Yes, Your Honor. He was — he was now — the threat was now to multiple officers. Yes, Your Honor. More than the first volley. Yes, Your Honor. First, he moves towards Officer Schultz. There's indication in the record that he shifts his attention at some point and starts moving towards Officer Carroll. The position of the officers is close enough that it could have been more than one, but he certainly keeps moving towards the officers at all times. Nothing in the record — there are nine videos available in this case. Five of them show different angles of the incident involved. Not one of them shows that he ever retreated. Not one of them shows that he ever stopped moving until the final shot — until after the final shot was fired. And all of them show at some point that he's moving towards the officers. And I see that I am running out of time. I would defer the rest of my — Do we know how many of the 18 shots were in the second volley and how many officers were shot in that second? I do not have that in front of me, Your Honor. But I do see, pending any further questions, I would defer the remainder of my time to Mr. Flynn. Counsel? Good morning, Joe Flynn, on behalf of the city of Edina and officers Peterson and Winandi. With regard to the distance, I point out in the record it would indicate that at the time just before the first shot was fired as the decedent was charging towards Officer Scholz and Peterson, he was indicated to be approximately 13 feet away and had advanced to within six feet at the time that the shots had — the first round of shots had concluded. I'd also point out that in order — Judge Loken indicated that how do you get around Hassan? They'd also have to get around Morgan. They'd have to get around Swearingen. They'd have to get around the U.S. Supreme Court decision in Casella v. Hughes. And they've cited no case law to do that. Well, that's clearly established, isn't it? Well, yeah, true, Your Honor. Are you saying we should decide that? No, I'm saying that the Court can decide it on constitutional grounds, but the Court did ask plaintiffs' counsel if he had any — Now, wait a minute. They're both constitutional grounds. Well, it's the first prong, Your Honor. Well, yes, but — It's not — Do you disagree with me that we would have to send it back for the second prong? Absolutely not. The Court can decide it on the first ground that there is no constitutional violation. But the Court did ask plaintiffs' counsel what their best argument was with regard to qualified immunity, and he would have to get around those cases, even if there was a constitutional violation, which there wasn't, and there's no need to go beyond that. We can't decide this on — that sounds like a futility argument. Well, I mean, it's — Prong one is — winning on prong one is futile. We can't decide that, can we? Well, you can decide that there was no constitutional violation, as the District Court found and affirmed. That's what we're asking you to do. Yes. I thought your brief argued that even if there were a violation, it was not clearly established. That's — that's true. We did, but the Court — Aren't you arguing in the alternative that we could affirm on an alternative ground? Absolutely. That's illegal. If the Court wished to go there, they could. And — All right. Well, I thought you just said a minute ago we'd have to remand, so — No, I never said you had to remand. Well, I thought Judge Loeb had asked you — That's not my argument. I think the record hopefully would show that I didn't say that. That there's no need to go beyond the constitutional — Well, I heard you say that, but we're talking about the hypothesis that the Court doesn't agree with you on that. What do we do next? And the question is, do we remand for a clearly established analysis, or do we proceed to do it? Well, if the Court thinks there's a constitutional violation, I think they can proceed — which there isn't. They can proceed to the clearly established prong. As it was argued in — Thank you. Is your argument that we can take up the clearly established prong because it presents a pure question of law at this point because the factual findings of Judge Schultz that are found in his order are sufficient facts for us to fully analyze the clearly established piece? Yes. That is absolutely correct. That is a constitutional issue. That's where I'm having trouble with your semantics. No, I — You're acting as though prong two of qualified immunity is somehow common law out there somehow. No, no. It's — no, I'm not. I'm just — Part of the Fourth — the Eighth Amendment analysis. Exactly. It's part of — it's part of the two prongs that the Court considers. And the Court — District Court here didn't get beyond the first prong. If we decide there was no constitutional violation — That's it. Fourth Amendment or Eighth Amendment violation, we don't get there. That's true. Absolutely. It was perfectly sound on that. Correct. And I would strongly concur with that. The plaintiff raises the issue — says that he has to — there has to be — in order for the Court to find that there is some constitutional violation, he has to use the argument that plaintiff — there needs to be some — he has to be close enough to lunge at the — at the officers. There's no law that uses that term that says that the decedent has to be within or the subject has to be within lunging distance. That's just a new standard that's created by Plaintiff's counsel. But even if it was the new standard created by Plaintiff's counsel, I mean, you don't got to be the athlete of the century to lunge six feet. That's absolutely true. And there's even — even the Casella case had the subject was just standing there six feet away, and that was without raising the knife in the direction of the officer and without making movements towards the officer, and that was sufficient for the Court to find that the threat was imminent. Thank you. I have nothing further. Thank you, Your Honors. What I'd like to start off with in rebuttal is that there were 18 shots fired. No one really has an idea, from my understanding, of what shots struck at which point. But we — there is some evidence that perhaps one of — one or two did strike on the first volley because, as was mentioned, there was some additional movement. And there's maybe something in the video that shows a hit on the first volleys. But while you don't have to be the athlete of the century to go six feet, that also takes into account the fact that you've also just seen a hail of gunfire go by your head once again, the totality of the circumstances. And from 13 feet away, I'm pretty sure that even a competitive knife thrower, as Judge Erickson alluded to, is going to be somewhat disadvantaged at that distance and is certainly not going to hopefully be under a mental health crisis when he steps up to the line to take a throw. He'd be holding that knife differently, too. And for all the reasons in argument, we'd ask that the Court reverse and remand this for action not inconsistent. Thank you, Your Honors. Thank you, Counsel. The case has been thoroughly briefed and argued. And unusual fact situation, which is not surprising in this — these issues. We'll take it under advisement.